**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

         v.

LENNIE PERRY,

                Defendant.

Case No. 18 CR 703

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

After Judge Matthew Kennelly denied his first *pro se* motion for release, Defendant Lennie Perry ("Perry") filed several supplementary Motions for Release due to COVID-19 concerns. (Dkt. Nos. 87, 88, 103, & 104). Perry also moves the Court to terminate the writ of habeas corpus ad prosequendum. (Dkt. No. 70.) For the reasons stated herein, Perry's Motions are denied.

## I. BACKGROUND

In April 2020, Perry filed a *pro se* motion for release due to COVID-19 concerns. Emergency Judge Matthew Kennelly denied the motion stating that "Perry has not shown he is an appropriate candidate for release on bond under 18 U.S.C. § 3142 or that there are compelling reasons warranting vacating of the prior detention order." (Order, Dkt. No. 84.) Judge Kennelly noted that Perry failed to "provide evidence of any factors that cause him to be at

higher risk of an adverse outcome should he contract the coronavirus." (*Id.*) Finally, Judge Kennelly stated that it "is important to point out that were Mr. Perry granted bond in his federal case, he could not be released into the community but instead would be returned to custody at the IDOC." (*Id.*)

Perry filed additional *pro se* Motions for release. James Graham then took over Perry's representation. Mr. Graham re-filed a supplementary Motion for Release and provided additional records to the Court. (Dkt. Nos. 103 & 104.) Perry also moves the Court to terminate the writ of habeas corpus ad prosequendum. (Dkt. No. 70.)

## II. **DISCUSSION**

### A. **Release Under § 3142(e)**

When a defendant has been charged with a qualifying crime involving a minor, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Perry is charged with eight counts of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1) & (b)(2). (*See* Indictment, Dkt. No. 1.) A § 1591 offense is a qualifying crime involving a minor. *Id.* § 3142(e)(3)(E). Therefore, there is a rebuttable presumption of pretrial detention.

Perry has put forth no evidence to rebut the presumption that his release will endanger the community. But even if Perry had rebutted the presumption, the § 3142(g) factors analysis supports continued pretrial detention. The § 3142(g) factors include: (1) the nature of the charges against the defendant; (2) the weight of the evidence against him; (3) his history and characteristics; and (4) the extent to which his release would pose a risk to any person or the community. 18 U.S.C. § 3142(g). As detailed below, each factor weighs against release.

Perry faces extremely serious allegations. The Indictment charges Perry with sex trafficking eight minors between the ages of 13 and 17. (*See* Indictment, Dkt. No. 1.) Specifically, the Government alleges that over a period of about five years, while on pretrial release for a different criminal case, Perry solicited minor victims to prostitute for him via Facebook and other websites. Once under Perry's employ, the victims would perform sex acts with paying customers at Perry's direction. Perry would then keep a portion of the proceeds for himself. Perry advertised the victims on Backpage.com, rented hotel rooms around Chicago, Illinois and in other states, and transported victims to those hotel rooms and customers' homes so that they could engage in commercial sex acts. The Government also alleges that Perry had sex with minor victims himself.

The weight of the evidence against Perry is strong. A grand jury found probable cause that Perry trafficked the eight victims named in the Indictment. Further, each of the eight victims told law enforcement that Perry arranged for them to have sex in exchange for money. (Resp. at 9, Dkt. No. 138.) Financial accounts associated with Perry used to purchase hotel rooms and Backpage.com advertisements corroborate these statements. (*Id.*) Additionally, a customer who had sex with some of the victims named in the Indictment identified some of the victims and said that he paid Perry in exchange for sex with the victims. (*Id.*)

In 2017, Perry was convicted of bribery and official misconduct. Perry, a former tow truck driver for the City of Chicago, had participated in a scheme where he solicited bribes from individuals whose cars, he towed in exchange for returning the cars to them. Perry was sentenced to nine years in prison for that crime, and he is not scheduled for release from IDOC custody until January 2022. This means that if Perry is released from federal custody, he will return to IDOC custody and then apply to the State of Illinois for compassionate release. Perry also has several other prior convictions, including: (1) a 1994 conviction for manufacture/delivery of controlled substances; (2) a 1994 conviction for illegal possession of a weapon by a felon; (3) a 1998 conviction for manufacture/delivery of cocaine; (4) a 2008

- 4 -

conviction for theft; and (5) a 2010 conviction for reckless driving.

Further, Perry's conduct in this litigation is concerning and demonstrates an unwillingness or inability to follow Court orders. On November 14, 2018, the Court issued a Protective Order prohibiting Perry, among other things, from disclosing discovery materials "directly or indirectly to any person or entity other than the persons employed to assist in the defense, persons who are interviewed as potential witnesses, counsel for potential witnesses, and other persons to whom the Court may authorize disclosure" but that "[p]otential witnesses . . . may not retain copies without prior permission of the Court." (Prot. Order at 1, Dkt. No. 18.) Perry then mailed copies of discovery to his wife in violation of the Protective Order. (*See* Perry Discovery Mot. at 1, Dkt. No. 94.)

In early 2019, Perry gave a handwritten note to another inmate to smuggle out of the MCC. (*See* Gov. Prot. Order Mot. at 3–4, Dkt. No. 41.) Perry asked the inmate to contact a relative who Perry directed to contact several individuals, including Minor D, the victim named in Count Four of the Indictment. (*Id.*) Specifically, Perry asked his relative to share the following message: "help me with this BS case they put on me and that I'll pay them for

helping." (*Id.*) After learning of this attempt, the Court admonished Perry. (2/28/19 Tr. 7:19–8:12, Dkt. No. 47.)

Then, in summer 2019, Perry exchanged emails and phone calls from the MCC with Minor D. (Gov. Prot. Order Mot. at 5.) Perry saved Minor D's name in the MCC email system under an alias, concealing her identity from MCC staff. (*Id.*) In one email, Perry asked Minor D to write an affidavit stating that she had been "set-up" and to write "everything else you know that would be helpful to me and [my wife], plus our children." (*Id.*) In another email, Perry asked Minor D for her "kids ages and name so I can send them Christmas gifts from Angel Tree." (*Id.*)

In fall 2019, Perry called his wife from the MCC and asked her to start a Facebook live stream to broadcast a statement over the internet. Perry's wife placed a video of this call on Perry's Facebook page. In the video, Perry read from a document he characterizes as an "affidavit" while his wife showed the text of the document on the video screen. During the call, Perry referred to victims Minor B and Minor D by their full first and last names, provided the full first and last name of an individual he identified as Minor B's child, and provided Minor D's phone number and the full residential address of Minor D's mother's house. (*Id.* at 4.) A few days later, MCC staff intercepted an envelope that Perry was attempting to mail to the *Chicago Tribune*. The envelope

contained the same information about Minor B and Minor D that was published on the Facebook live stream. (*Id.* at 6.)

After learning of this conduct, the Court entered the Second Protective Order that prohibits Perry from having any contact with victims, directly or indirectly. (Second Prot. Order at 1, Dkt. No. 46.) The Order further prohibits Perry from disseminating the full name of any victim and from filing any documents with the Court containing the full name of any victim. (*Id.* at 2–3.) Perry has since filed several documents identifying victims by their full first and last names. (*See, e.g.,* Dkt. Nos. 61 & 73.)

The Court is very concerned about its ability to monitor Perry if it grants this Motion and IDOC then releases Perry out into the community. The Government accuses Perry of recruiting children via Facebook and other websites to perform sex acts for money. While incarcerated, Perry has managed to: (1) contact some of the alleged victims; (2) publicize victim names and other information; and (3) access Facebook indirectly through his wife. If released, the likelihood that Perry would continue his attempts to contact and harass victims (or to recruit new victims) is high. This concern is heightened by the fact that Perry would have unlimited and unmonitored access to the internet—the very tool he is accused of using to recruit the child victims in this case. Undoubtedly, Perry's release would pose a significant risk to the community.

Every factor in this assessment weighs against release and in favor of continued pretrial detention. Thus, there are no conditions or combination of conditions that "will reasonably assure [Perry's] appearance . . . as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court will not release Perry under this provision.

## B. Temporary Release Under § 3142(i)

18 U.S.C. § 3142(i) permits a court to temporarily release a detained defendant to the custody of an "appropriate person" where a "compelling reason" necessitates such release. Recently, many courts have addressed whether the COVID-19 pandemic constitutes a "compelling reason" to justify temporary release under § 3142(i). *See, e.g.*, *United States v. Alderete*, No. CR 19-1989 JB, 2020 WL 2572716, at \*25–\*33 (D.N.M. May 21, 2020); *United States v. McKnight*, No. CR18-16 TSZ, 2020 WL 1862412, at \*2–\*3 (W.D. Wash. Apr. 15, 2020); *United States v. Boatwright*, No. 2:19-CR-00301-GMN-DJA, 2020 WL 1639855, at \*4 (D. Nev. Apr. 2, 2020); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at \*3 (D. Kan. Mar. 25, 2020). Several of these courts applied a four-factor test announced in *United States v. Clark* to analyze such requests. 2020 WL 1446895, at \*3–\*8; *see, e.g.*, *McKnight*, 2020 WL 1862412, at \*2–\*3; *United States v. Miller*, CR 20-12-BLG-DLC-1, 2020 WL 1864633, at \*2–\*4 (D. Mont. Apr. 14, 2020); *United States v.*

*Hussein*, 20-mj-0089 (HB), 2020 WL 1853656, at *4 (D. Minn. Apr. 13, 2020); *United States v. Lake*, 19-cr-00500-RM, 2020 WL 1852435. at *3 (D. Colo. Apr. 13, 2020); *Boatwright*, 2020 WL 16399855, at *4; *Alderete*, 2020 WL 2572716, at *25–*33.

"While the generalized risks of COVID-19 cannot be disputed, courts evaluating whether pretrial release is necessary must evaluate the particularized risks posed to an individual defendant." *United States v. Pruitt*, No. 17-CR-20183-4, 2020 WL 1698661, at *6 (E.D. Mich. Apr. 8, 2020) (citing *United States v. Lee*, No. 19-20112, 2020 WL 1540207, at *3 (E.D. Mich. Mar. 30, 2020)). For that individualized determination, *Clark* provides the following non-exclusive factors: (1) the original grounds for the defendant's pretrial detention; (2) the specificity of the defendant's stated COVID-19 concerns; (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. *Clark*, 2020 WL 1446895, at *3. "The question for the Court is whether the COVID-19 health risks to the Defendant, should he remain detained, outweigh those traditional [§] 3142(g) factors *and* the COVID-19 health risk to the community that Defendant's release could occasion." *United States v. Fomukong*, No. 17-CR-00661-PWG-1, 2020 WL 3073321, at *6 (D. Md. June 10, 2020)

- 9 -

(citation omitted). As in his first Motion, Perry cites COVID-19 as the reason for release. Therefore, the Court utilizes the *Clark* factors to assess Perry's renewed Motions. Ultimately, the analysis does not support release.

First, as explained previously, Perry is charged with a qualifying crime involving a minor, and there is a rebuttable presumption of pretrial detention. The Court's analysis of the § 3142(g) factors overwhelmingly demonstrates that Perry is a danger to the community and that no condition or combination of conditions could reasonably assure the safety of the community. *See also Pruitt*, 2020 WL 1698661, at *6 (concluding the same regarding a pretrial detainee also facing § 1591 charges). This factor weighs heavily in favor of detention.

Second, Perry presents several pages worth of medical records to support his concerns about COVID-19. (*See* Medical Records, Perry Mot., Exs. B-E, Dkt. No. 103-2-6.) These records confirm that Perry is a 45-year old African American male who had gastric bypass surgery in 2014, manages hypertension with medication, and uses a CPAP machine for sleep apnea. (*See id.*) The Court is sympathetic to Perry's concerns about COVID-19 and mindful of the pandemic's magnitude and seriousness, particularly when it comes to places like the MCC:

> Though the BOP has admirably put transmission mitigation measures in place, see Federal Bureau of Prisons,

> Federal Bureau of Prisons COVID-19 Action Plan,
> https://www.bop.gov/resources/news/20200313_covid-19.
> jsp, in the event of an outbreak at the [MCC] (where the
> Defendant is currently being detained), substantial
> medical and security challenges would almost certainly
> arise. A comprehensive view of the danger the Defendant
> poses to the community requires considering all factors—
> including this one—on a case-by-case basis.

*United States v. Landji*, No. (S1) 18 CR. 601 (PGG), 2020 WL
1674070, at *5 (S.D.N.Y. Apr. 5, 2020) (citations omitted).

Approximately 126 inmates and 30 staff members at the MCC
have tested positive for COVID-19. Many of those infected inmates
and staff members were medically cleared and have already returned
to work or the general inmate population. (Resp. at 11.) The
remaining infected inmates and staff members are recovering in
isolation. (*Id.*) There is no evidence that Perry was specifically
exposed to the virus nor has he exhibited any COVID-19 symptoms.
(Gov. Supp. at 1, Dkt. No. 140). Nevertheless, the MCC proactively
tested Perry for COVID-19 in late June. (*Id.*) The results were
negative. (*Id.*)

Perry's hypertension might put him at "an increased risk for
severe illness from COVID-19," but his medical records reflect
that he is receiving adequate care to manage this and other health
conditions. *See* CDC, *Coronavirus Disease 2019 (COVID-19), At Risk
for Severe Illness,* CTRS. FOR DISEASE CONTROL & PREVENTION (last updated
June 25, 2020), https://www.cdc.gov/ coronavirus/2019-ncov/need-
extra-precautions/groups-at-higher-risk.html. (*See* MCC Records,

Perry Mot., Ex. E, Dkt. No. 103-6.) The medical records also demonstrate that Perry regularly takes his medications and seeks/receives treatment from healthcare professionals when he needs it. (*See id.*) In his reply, Perry mentions some challenges with the fit of his new CPAP machine mask that has made it difficult for him to use the machine to manage his sleep apnea. (Reply at 2, Dkt. No. 139.) But Perry does not establish that his individual placement conditions heighten the possibility of exposure to the virus or that the MCC is somehow mismanaging his health. Thus, Perry has not established that the risk the COVID-19 virus poses to him is greater than the risk to any other MCC inmate.

As to the third and fourth factors, Perry has not addressed the extent to which his proposed release mitigates or exacerbates other COVID-19 risks to him or how his risk of exposure is any different inside the MCC as compared to IDOC or out in the community. Indeed, Perry has not advanced any sort of release plan, likely because release into the community depends on his compassionate release from IDOC custody. If IDOC releases Perry, he proposes home detention and electronic monitoring. Perry suggests that a girlfriend who was recently furloughed and lives in Chicago with her two children, ages one and two, serve as his third-party custodian. (Perry Mot. at 3, Dkt. No. 103.) Alternatively, Perry proposes his wife, recently homeless but now

living with relatives, as a third-party custodian. (Reply at 3.) The Court is skeptical that either person is an appropriate custodian because of the apparent lack of stability in their individual circumstances but also because Perry committed the acts alleged in the Indictment while out on pretrial release for another crime. If incarceration at the MCC has not deterred Perry from contacting victims and posting on Facebook, the Court doubts that home detention and electronic monitoring would achieve that aim.

Perry also fails to make a showing that he would be at lower risk of contracting COVID-19 at IDOC, living with his girlfriend and her children, or living with his wife, relatives, and children compared to his current risk at the MCC. *See McKnight*, 2020 WL 1872412, at *4 (denying release where defendant failed to show how release would reduce exposure); *Boatwright*, 2020 WL 1639855, at *7 (noting that the defendant "fails to explain who else has or will live in or frequent the home or identify any screening practice or concrete COVID-19 precautions taken there" and "therefore offers nothing more than mere speculation that home detention would be less risky than detention at [Nevada Southern Detention Center], which has screening practices and other reasonable COVID-19 precautions in place"); *see also Lake*, 2020 WL 1852435 at *3 (indicating that the defendant "has not explained how his proposed

release plan mitigates any danger to himself (other than removing him from the . . . facility)").

Indeed, Perry's release to IDOC would likely increase the risk to state correctional officers, and if released out into the community, the several people he is expected to interact with, including: his girlfriend, wife, children, relatives, other visitors, and the Pretrial Services Office. First, if Perry is released to IDOC and not granted compassionate release, this Court would need to issue a writ every time Perry was set to appear in Court. This places a heavy burden on correctional staff who would need to transport Perry back and forth. Such movement could also pose a risk of exposing Perry and correctional officers to COVID-19 during transport, which would then increase the risk of infecting other inmates and IDOC staff.

Second, if IDOC were to release Perry, the ongoing monitoring and supervision required during temporary release, and any need to take Perry back into custody, could further expose Pretrial Services officers to COVID-19. *McKnight*, 2020 WL 1872412, at *4 (citing *Boatwright*, 2020 WL 1639855, at *8). Perry fails to explain how his release to IDOC and/or the community would mitigate COVID-19 risk to himself (other than removal from the MCC) or others. These factors weigh heavily in favor of continued detention.

The Court is not convinced that Perry should be selected for release when this analysis, the law, his personal characteristics, and his criminal history clearly weigh against it. Thus, the Court does not find a "compelling reason."

### C. Other Arguments

Perry cites the Fifth, Sixth, and Fourteenth Amendments in support of his release. The conclusory citation seems to imply that Perry believes his continued pretrial detention somehow violates these constitutional rights and that the only remedy is immediate pretrial release. Perry did not expand upon, nor can the Court determine, how his Fifth Amendment or Fourteenth Amendment rights are violated by continued pretrial detention.

The Court assumes that Perry cites the Sixth Amendment to assert that his right to counsel has been violated by the MCC's revised visitation policies as part of its COVID-19 management plan. The Court is aware that Perry has had at least three telephonic/video conferences with his counsel. (*See* Joint Status Rep. at 2, Dkt. No. 135.) While these circumstances are obviously not ideal, the Court sees no reason why Perry's counsel cannot properly advise him via telephone/video during this unprecedented time. *See Miller*, 2020 WL 1864633, at *4 (finding counsel can properly advise client via telephone during pandemic). Thus, the Court finds no constitutional violation.

Perry also moves the Court to terminate the writ of habeas corpus ad prosequendum because he seemingly prefers IDOC to the MCC. (*See* Dkt. No. 70.) This reason is insufficient to terminate the writ, especially because Perry's case remains pending and is set for trial this fall. Therefore, Perry will stay at the MCC.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Court denies Perry's Motions. (Dkt. Nos. 70, 87, 88, 103, & 104.)

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 7/8/2020

- 16 -